UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LIFE INSURANCE COMPANY
OF THE SOUTHWEST,
a Texas insurance corporation,

    Plaintiff,                                   Case No. 8:20-cv-00888-MSS-JSS

v.

DAVID GREENBAUM and DEBBY RATH, as
Parents and natural guardians of
R.G., a minor; and MARTY MELTON, in his
individual capacity and in his capacity as the Personal
Representative of the Estate of Sandra Rostig,
deceased,

    Defendants.
_____/

**<u>DAVID GREENBAUM'S MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW</u>**

David Greenbaum, as parent and natural guardian of R.G., pursuant to Rule 56, Federal Rules of Civil Procedure, moves for a summary judgment on Co-Defendant/Cross-Claimant Marty Melton's cross-claim and on Count I of Greenbaum's cross-claim based on a finding that he is entitled to receive the disputed funds at issue in this interpleader action.

**<u>UNDISPUTED MATERIAL FACTS</u>**

1.     David Greenbaum ("Greenbaum"), is the parent and natural guardian of R.G., a minor.

2.     On or about February 22, 2008, Plaintiff, Life Insurance Company of the Southwest ("LSW") issued Sandra J. Rostig ("Rostig") a "Flexible Premium

Equity-Indexed and Declared-Interest Deferred Annuity Policy," policy number ending 262X (the "Annuity Policy"). A true and correct copy of the Annuity Policy is attached hereto as Exhibit 1. *See* Greenbaum Amend. Cross-claim ¶ 6; Melton Ans. ¶ 6.

3. Rostig was the owner of the Annuity Policy and purchased it for an initial premium of $300,000.00. *See* Greenbaum Amend. Cross-claim ¶ 7; Melton Ans. ¶ 7.

4. Rostig died on December 26, 2019 at 5:28 p.m. *See* Greenbaum Amend. Cross-claim ¶ 30; Melton Ans. ¶ 30.

5. R.G. was listed as the designated beneficiary of the Annuity Policy on the date of Rostig's death.

6. Under the terms of the Annuity Policy, LSW is required to pay a death benefit to the beneficiary upon receipt of proof of death of the owner, as follows:

> **Death Benefits**
>
> We will pay a Death Benefit to the Beneficiary when We receive due proof of death of the Owner or the Annuitant and any Contingent Annuitant occurring before the Annuity Date, subject to the terms of this Policy.

7. The Annuity Policy further states that the death benefit is payable upon the owner's death and calculated as follows:

> **Death Benefits**
>
> While this Policy is in force and prior to the Annuity Date, a Death Benefit will be payable at the earlier of:
>
> - Your death; or

- if You are not the Annuitant, the death of the Annuitant.

The Death Benefit will be the greater of the Policy Value or the Accumulation Value as of the date of death if the Annuitant dies. The Death Benefit will be the Cash Value as of the date of death if You die and You are not the Annuitant. Payment will be made to the Beneficiary upon receipt of due proof of death. The payment will be in a single sum unless the Beneficiary elects otherwise.

8. The Annuity Policy defines Beneficiary in relevant part as follows:

**Beneficiary**: The Beneficiary of this Policy on the Issue Date is named in the application. The primary Beneficiary will receive any Death Benefit payable under this Policy.

**Minors**. If the Beneficiary is a minor, We will make payment to the minor's Guardian.

9. The Annuity Policy defines Policy Value as follows:

**Policy Value**. The Policy Value at any time is equal to:

100% of the premiums paid; less

10% of the premiums paid for expenses and guarantees; plus
any Excess Interest Credits; less

any amounts withdrawn (excluding any applicable Withdrawal Charges);

plus or minus as applicable, interest on the above items credited annually at the rate shown on Page 3.

10. The Annuity Policy defines Accumulation Value as follows:

**Accumulation Value**. The Accumulation Value at any time equals the sum of the Premium Account and the Interest Accounts.

11. The Annuity Policy defines Premium Account as follows:

**Premium Account**. The value of the Premium Account at any time is equal to:

    All Net Premiums paid; plus

3

>   all interest credited to the Premium Account; less
>
>   all transfers from the Premium Account; less
>
>   all amounts withdrawn from the Premium Account (including any applicable Withdrawal Charges).

12. The Annuity Policy defines Interest Accounts, Declared Interest Account, and Indexed Interest Account as follows:

> **Interest Accounts**. We make two interest crediting methods available for the Interest Accounts under this Policy: crediting of interest based on an interest rate declared in advance or crediting of interest based on the performance of an Index. Interest Accounts for which an interest rate is declared an advance are called **Declared Interest Accounts**. Interest Accounts based on the performance of an Index are called **Indexed Interest Accounts**.
>
> **Declared Interest Account.** The value of a Declared Interest Account at any time is equal to:
>
>> all transfers to the Declared Interest Account; plus
>>
>> all Declared Interest credited to the Declared Interest Account; less
>>
>> all transfers from the Declared Interest Account; less
>>
>> all amounts withdrawn from the Declared Interest Account (including any applicable Withdrawal Charges).
>
> **Indexed Interest Account**. The value of an Index Interest Account at any time is equal to:
>
>> all transfers to the Index Interest Account; plus
>>
>> all Indexed Interest credited to the Indexed Interest Account; less
>>
>> all transfers from the Indexed Interest Account; less

all amounts withdrawn (including any applicable Withdrawal Charges).

13. The Annuity Policy allows for partial withdrawal requests during the life of the owner/annuitant, as follows:

**Partial Withdrawals**

Prior to the Annuity Date, You may withdraw part of the Cash Value of this Policy at any time.

* * *

We will deduct Partial Withdrawals from the Account(s) with the most recent Reset Date, then from the Accounts(s) with the next most recent Reset Date, and so on until the required withdrawal amount is met. Partial Withdrawals are subject to the following limits:

- each Partial Withdrawal must be at least $500.00; and

- a Partial Withdrawal may not reduce the Accumulation Value to less than $2,500.

Please note that the order of withdrawal, whether interest or principal, may not be identical to the order of withdrawal of earnings or premiums as characterized by the Internal Revenue Service.

We will also deduct any Partial Withdrawal, less any Withdrawal Charge assessed, from the Policy Value.

14. The Annuity Policy contains no provisions for the automatic withdrawal of funds, nor does it provide that a withdrawal request is effective upon signing by the customer or upon receipt by LSW. By contrast, with respect to beneficiary changes, the Annuity Policy states that a request to change a beneficiary "will take effect when signed, subject to any action We take before receiving it."

15. The Annuity Policy also contains no guarantee or requirement that LSW must pay the withdrawal amount requested even if the Policy's value declines between the time the request is made and the time it is honored.

16. When LSW receives a withdrawal request, the request goes through a document management system and sits in a queue. LSW typically processes the oldest requests first. When a request is ready to be processed, LSW evaluates whether it is "in good order" or "not in good order," that is, whether LSW has received all of the compliance and fraud prevention requirements needed to do the withdrawal. LSW depo. (Kim Gray), at 9:1-16. In validating the information in a withdrawal request, there is a "big list" of things LSW checks for compliance, including whether there is money in the policy, signature, spousal signature, and banking information. LSW wants to make sure that it is protecting its customers' interest and complying with regulations. *Id.* at 10:1-3, 14:6-20; Exh. 3. Processing a request is a multi-step procedure with double and triple checking to ensure everything is done correctly. *Id.* at 20:2-23.

17. To verify a signature, LSW compares the withdrawal request to prior signatures on record. If there is an issue with the signature, LSW may require another signature document, like a driver's license, passport, or W-9 to be completed. *Id.* at 10:8-17, 15:17-22. If that signature does not match, it is a "hard stop" in the process and then they will ask for a notarized signature. *Id.* at 16:1-8, 23:1-23, 38:18-21.

18.     LSW's representative testified that the time it takes to perform the initial validation process can vary vastly. It can take 5 to 20 minutes if everything is in good order. If a request is not in good order, it depends on the response LSW receives from the person making the request. LSW advises its customers that it takes 12 to 15 business days to completely process a request. *Id.* at 19:2-6, 24:3-11, 48:10-15.

19.     When a person requests that LSW rush a withdrawal request, LSW will place that request at the head of the queue. Otherwise, the validation process does not change except that LSW scrutinizes rush requests more closely and performs additional validations to prevent fraud. *Id.* at 31:23 – 33:9.

20.     In LSW's deposition, its representative identified several withdrawal requests from Sandra Rostig between February, 2010 and December, 2018, none of which included a W-9 form. *Id.* at 42:2-44:16, Exh. 8. In fact, LSW produced no W-9 forms signed by Rostig in connection with any prior withdrawal requests.

21.     On December 23, 2019, an LSW customer service representative received a call from Sandra Rostig inquiring about a $100,000.00 withdrawal. LSW recorded the phone conversation. *Id.* at 47:11-18, Exh 10; 49:1-53:13.[1] In the conversation, Rostig told the representative, "I'm leaving the country for medical help. I need to withdraw 100,000 from my policy on an expedited basis." She then asked the representative to e-mail the form to her husband, Marty Melton. *Id.* at

---

[1] LSW produced recordings of the phone conferences referenced herein, and they are available for the Court's review.

49:7-24. Melton then got on the line and stated that Rostig needed to be medically transported out of the country. *Id.* at 51:6-7. Later in the recording, the LSW representative informed Melton that processing could take up to 11 business days. *Id.* at 51:18-21.

22. The same day, the LSW rep e-mailed a withdrawal request form to Melton. *Id.* at 45:23-47:2, Exhs. 9, 10.

23. The following day, December 24, at 8:36 a.m., Melton sent the rep an e-mail asking which section needed to be filled out and advising that he had printed the forms and was taking them to the hospital for his wife to sign. The rep responded at 8:48 a.m. *Id.* at 55:22-56:10.

24. On Thursday, December 26, 2019 at 8:11 a.m., Melton sent LSW an e-mail with not one, but two, signed withdrawal request forms, one for $100,000.00 and another one for $45,000.00. *Id.* at 56:12-20, Exh. 12. Later that day, Rostig died.

25. The requests were dated December 24 and LSW determined that the signatures on the requests did not look enough like Rostig's in comparison to her prior signatures on file for LSW to continue processing the request. *Id.* at 56:21-57:13. The disparity in signatures triggered a verification review. *Id.* at 59:11-60:8. As a result, LSW issued a "not in good order letter" dated December 27, 2020 asking Rostig to sign the W-9 form it enclosed with its letter. *Id.* at 61:5-62:10, Exh. 14.

26. On January 9, 2020, LSW received a call from Melton, which LSW also recorded. *Id.* at 62:12-68:8, Exh. 15. Melton stated that he had the letter from LSW

8

requesting additional information and he wondered "why are we sending this information?" *Id.* at 63:14-17. The rep then asked Melton, "Sir, is your wife with you?" To which Melton responded: "No, she's not with me. She's in the hospital. She's the one that authorized this in the first place." *Id.* at 63:19-22.

27. Since Rostig was not on the line (she had passed away two weeks earlier), the rep was not authorized to explain why LSW needed the form completed. Melton then stated, "All right, so I'll fill this out." *Id.* at 64:3-65:15.[2]

28. Melton did not mention that Rostig had passed away. If he had, LSW would have begun a death claim, which is a "hard stop" of the validation process. The withdrawal request and validation process would have ended, and the file would have moved to the Claims Department. *Id.* at 69:13-70:7.

29. LSW then received via fax from Melton a copy of Rostig's driver's license and, rather than a signed copy of the W-9 form it had enclosed with its December 27 letter, a W-9 purportedly signed by Rostig and dated December 24, 2019, three days *before* LSW sent its letter asking Rostig to sign the W-9 form it had enclosed. *Id.* at 70:9-71:8, Exh. 16.

30. The signature on the W-9 also appeared to be different from the signatures LSW had on file for Rostig, as well as the signature on her driver's

---

[2] The deposition transcript does not exactly match what Melton said. The recording of the phone call states, "I'll just fill out what you're asking for on the sheet here and have her sign and send it back to you." *See* Call Recording, 1/9/2020 at 4 minutes 48 seconds.

9

license. Consequently, the W-9 would not have satisfied LSW's verification procedures, and LSW would have asked for a notarized signature. *Id*. at 71:3-72:5.

31. LSW did not ask for a notarized signature, however, because by the time it had reviewed the W-9, LSW had determined that Rostig had died. *Id*. at 72:6-11.

32. The policy owner passing away is another reason for LSW to find that a request is not in good order. *Id*. at 76:16-21. In Rostig's case, LSW never got to the payment processing phase of the process. It was still on the verification phase when Rostig died. *Id*. at 78:23-79:14.

33. On January 13, 2020, LSW learned that Rostig had passed away after it reviewed a database and determined that Rostig's Social Security number was identified with a deceased person. LSW then sent a letter to Melton advising of its finding. LSW depo. (Kathy Bennett), at 5:13-25, 23:3-9, Exh. 17.

34. Melton then called LSW and asked about the withdrawal request, stating, "She's got medical bills that I paid for and she wanted to pay me back." *Id*. at 10:7-8. The rep then advised Melton that the file was in a pending claim status. She asked him directly whether Rostig had passed away, and Melton finally advised LSW that she had. *Id*. at 10:15-19. The rep then instructed Melton that he would need to communicate with the Claims Department. She could not approve the transaction. *Id*. at 11:22-12:8, 18:13-19:1.

35. After confirming that Rostig had passed away, LSW's Claims Department reviewed the file to determine whether the withdrawal requests should

have been honored. *Id*. at 22:18-24. In its review, LSW found several red flags in addition to the requests not being in good order due to the issue with the signatures, including that Melton did not disclose that his wife had passed away in the January 9 phone conversation: "we make sure that the person is living and that we are being told the truth on phone conversations." *Id*. at 23:10-20.

36. In addition, LSW considered the two withdrawal requests to be suspicious because Rostig had only mentioned one request in the phone conversation. *Id*. at 24:17-25:2. Finally, Melton submitted a W-9 form purportedly signed by Rostig prior to LSW's asking for it. *See* LSW depo. (Kim Gray), at 78:1-5 ("I don't see the timeline adding up that Ms. Rostig could have signed that . . . without him knowing that we needed it. She signed it prior to us notifying him that we needed it, which doesn't add up.").

37. At the time of Rostig's death, no funds had been withdrawn from the Annuity Policy in response to the withdrawal requests.

38. Greenbaum, on behalf of his son, R.G., has made a claim for the Annuity's Death Benefit in the amount of 100% of its value.

## ARGUMENT

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of identifying those portions of the record that show the absence of a genuine issue of material fact. *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d

11

1347, 1349 (11th Cir. 1996). Once the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating an issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (citation omitted). The non-movant must provide more than a "mere 'scintilla' of evidence" supporting its position, and "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

A court draws all reasonable inferences from the evidence in the light most favorable to the non-movant and resolves all reasonable doubt in the non-movant's favor. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). In addition, the court does not make credibility determinations when ruling on a motion for summary judgment. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Summary judgment should be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Summary judgment is particularly suited to cases of insurance coverage because the interpretation of a written insurance contract is a question of law to be decided by the court. *See Youngblood v. State Farm Mut. Auto. Ins. Co.*, 8:13-CV-2607-T-26EAJ, 2015 WL 10891875, at *4 (M.D. Fla. Feb. 27, 2015), *affirmed,* 638 Fed. Appx. 837 (11th Cir. 2015).

Under Florida law, an insurance contract is interpreted using ordinary contract principles. If the terms of an insurance contract are clear and

12

unambiguous, a court must interpret the contract in accordance with its plain meaning and, unless an ambiguity exists, a court should not resort to outside evidence or complex rules of construction. The terms of an insurance policy should be understood in their ordinary sense and the court should give the policy a reasonable, practical and sensible interpretation. If, and only if, a contract is ambiguous should the court construe it to determine the parties' intent. *See Hassoun v. Reliastar Life Ins. Co.*, 288 F. Supp. 3d 1334, 1352 (S.D. Fla. 2018) (citations omitted).

### I. The Unambiguous Terms of the Annuity Policy Require That the Disputed Funds be Paid to the Beneficiary.

Melton contends that he is entitled to receive $145,000.00 from the Annuity Policy because Rostig made withdrawal requests in that amount prior to her death. Melton is wrong. As LSW itself has argued in this case, the Annuity Policy's unambiguous terms make clear that any funds in the annuity at the time of the annuitant's death are payable to the designated beneficiary upon the annuitant's death and provides no exceptions for pending withdrawals. *See* Doc. 61 (LSW Motion to Dismiss). Summary judgment in favor of Greenbaum is therefore warranted.

First, the Annuity Policy expressly and unambiguously states that the Death Benefit is payable upon the death of the Annuitant. As reflected in the emphasized language below, the amount of the Death Benefit is equal to the greater of the policy's Accumulation Value or the Policy Value, both of which are calculated as of the date of the Annuitant's death:

13

> **Death Benefits**: We will pay a Death Benefit to the Beneficiary when We receive due proof of the death of the Owner or the Annuitant… subject to the terms of this Policy.
>
> **Beneficiary**: The Beneficiary of this Policy on the Issue Date is named in the application. The primary Beneficiary will receive any Death Benefit payable under this Policy.…
>
> **Minors**. If the Beneficiary is a minor, We will make payment to the minor's guardian.…
>
> **Death Benefits**. While this Policy is in force and prior to the Annuity Date, a Death Benefit will be payable at…: Your death.… The Death Benefit will be the greater of the <u>*Policy Value or the Accumulation Value as of the date of death if the Annuitant dies.*</u>… Payment will be made to the Beneficiary upon receipt of due proof of death.

Next, in spelling out how to calculate the Policy Value and the Accumulation Value, the Annuity Policy language repeatedly makes clear that the amount paid to the beneficiary is to be reduced only for amounts actually withdrawn, not requested withdrawals. Policy Value is defined as follows with the relevant language emphasized:

> **Policy Value**.  The Policy Value at any time is equal to:
>
> 100% of the premiums paid; less10% of the premiums paid for expenses and guarantees; plus
>
> any Excess Interest Credits; <u>*less any amounts withdrawn*</u> (excluding any applicable Withdrawal Charges); plus or minus as applicable, interest on the above items credited annually at the rate shown on Page 3.

The emphasized language states that the Policy Value, "at any time," includes a reduction for "any amounts withdrawn." The Annuity does *not* say that the value of this account is reduced by any amounts in pending withdrawal requests.

14

Accumulation Value is defined as the sum of the Premium Account and the Interest Accounts. The Premium Account also is to be reduced only for amounts actually withdrawn, as follows:

> **Premium Account**.  The value of the Premium Account at any time is equal to: All Net Premiums paid; plus all interest credited to the Premium Account; less
>
> all transfers from the Premium Account; <u>less</u>
>
> <u>*all amounts withdrawn*</u> from the Premium Account (including any applicable Withdrawal Charges).

The Annuity Policy's definitions of Interest Accounts, Declared Interest Account, and Indexed Interest Account also refer to "amounts withdrawn" as follows:

> **Interest Accounts**.  We make two interest crediting methods available for the Interest Accounts under this Policy: crediting of interest based on an interest rate declared in advance or crediting of interest based on the performance of an Index. Interest Accounts for which an interest rate is declared an advance are called **Declared Interest Accounts**.   Interest Accounts based on the performance of an Index are called **Indexed Interest Accounts**.
>
> **Declared Interest Account.**  The value of a Declared Interest Account at any time is equal to:
>
> all transfers to the Declared Interest Account; plus
> all Declared Interest credited to the Declared Interest Account; less all transfers from the Declared Interest Account; <u>*less all amounts withdrawn*</u> from the Declared Interest Account (including any applicable Withdrawal Charges).
>
> **Indexed Interest Account**. The value of an Index Interest Account at any time is equal to:
>
> all transfers to the Index Interest Account; plus
> all Indexed Interest credited to the Indexed Interest Account; less all transfers from the Indexed Interest Account; <u>*less all amounts*</u>

*withdrawn* (including any applicable Withdrawal Charges).

Putting this policy language together, the designated beneficiary, in this case Greenbaum on behalf of R.G., is entitled to a Death Benefit, payable upon the date of Rostig's death, equal to the greater of the Annuity's Policy Value or Accumulation Value as of the date of Rostig's death, with those amounts reduced only by "amounts withdrawn," not amounts requested to be withdrawn.

Had LSW intended that the Death Benefit account for requests made, it could have included language to that effect in the policy, as it did with respect to change of beneficiary requests, as follows:

> Change of Beneficiary. You may change the Beneficiary at any time during the Annuitant's life. A written request in a form acceptable to Us must be made at Our Home Office…. *The request will take effect when signed,* subject to any action We take before receiving it.

The Annuity Policy expressly states that a beneficiary change is effective upon signing. Thus, under the unambiguous language of the Annuity Policy, the amount and timing of the Death Benefit depends only on whether funds actually had been withdrawn on the date of death, not when a withdrawal request is signed or received. It is undisputed that the requested funds had not been withdrawn from the Annuity Policy as of the day Rostig died. Consequently, the terms of the Annuity Policy dictated that the funds remained in the Annuity to be part of the Death Benefit to be paid to R.G..

**II.     LSW's Withdrawal Request Procedures and its Review of the Withdrawal Requests Confirm that R.G. is Entitled to the Full Death Benefit.**

Consistent with this interpretation of the Annuity Policy, LSW's withdrawal request validation procedures mandate that a death claim is a "hard stop" in any ongoing validation of a withdrawal request. Once LSW is advised of a policyholder's death, it stops its validation process and the file goes to the Claims Department. LSW depo. (Kim Gray), at 69:13-70:7; *see, e.g., Brevard County Fair Ass'n, Inc. v. Cocoa Expo, Inc.*, 832 So. 2d 147, 152 (Fla. 5th DCA 2002) (observing that courts often look to the conduct of the parties in their course of dealings to determine the meaning of a contract). Here, it is undisputed that Rostig passed away before LSW completed its validation of the requests at issue, and at that point LSW's consideration of the requests stopped and the requests were never honored.

Notably, Melton does not and cannot contend that LSW should have honored and processed the requests in between the time they were submitted and the time of Rostig's death, as the requests were made literally hours before Rostig's death. Nor can he argue that LSW had any obligation to honor the requests regardless of the circumstances without following its fraud protection validation procedures. To the contrary, LSW had the right, and the obligation, to take steps to verify that the requests were legitimate before honoring the withdrawal requests. *Cf., United States Life Ins. Co. in the City of New York v. Logus Mfg. Corp.*, 845 F. Supp. 2d 1303, 1321 (S.D. Fla. 2012) (life insurer owed no duty to a substitute beneficiary to facilitate a beneficiary change).

17

Melton also does not and cannot claim that LSW acted wrongfully in following its validation procedures and determining that the requests were not in "good order" due to the signatures on the withdrawal requests appearing different from Rostig's known signature and therefore requiring validation.[3] Having properly followed those procedures, LSW never determined that the requests were valid and payable prior to Rostig's death (despite Melton's apparent efforts to hide Rostig's death from LSW), at which point the validation process reached a "hard stop" and a death claim was opened.

Finally, LSW subsequently determined that there were several "red flags" that supported its decision not to honor the requests without further investigation in addition to the disparity in signatures, including the two separate requests, Melton's failure to disclose his wife's death, and his submission of a W-9 form purportedly signed by Rostig prior to LSW's requesting it. In this regard, Melton's actions indicate that he understood that LSW likely would not honor the requests once it learned of Rostig's death. He therefore is in no position to argue a contrary interpretation, and the funds rightly belong to R.G..

## CONCLUSION

For the foregoing reasons, Greenbaum request that the Court enter summary judgment declaring that the disputed funds and any interest are payable to

---

[3] As reflected in Greenbaum's cross-claim, Greenbaum also contends that the withdrawal requests were invalid for a number of reasons, including forgery and fraud. In moving for summary judgment based on the language of the Annuity Policy, Greenbaum does not waive those arguments.

18

Greenbaum, as parent and natural guardian of R.G..

Dated: August 25, 2021

Respectfully submitted,

**BARKER & COOK, PA**

By: /s/ William J. Cook
William J. Cook, Esquire
Florida Bar No. 986194
501 E. Kennedy Boulevard, Suite 1040
Tampa, Florida  33602
Telephone: (813) 489-1001
Facsimile: (813) 489-1008
wcook@barkercook.com
Attorneys for David Greenbaum

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was electronically filed and served by electronic notification to all counsel listed on the Court's CM/ECF system, on this 25th day of August, 2021.

By: /s/ William J. Cook
William J. Cook, Esquire