UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LIFE INSURANCE COMPANY
OF THE SOUTHWEST, a
Texas insurance corporation,

      Plaintiff,                       **CASE NO. 8:20-cv-00888-MSS-JSS**

v.

DAVID GREENBAUM and DEBBY RATH,
as Parents and natural guardians of R.G., a
minor; MARTY MELTON, in his individual
capacity and MARTY MELTON in his
capacity as the Personal Representative
of the Estate of Sandra Rostig, deceased,

      Defendants.

_____/

**<u>MARTY MELTON'S RESPONSE IN OPPOSITION TO DAVID
GREENBAUM'S MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW</u>**

COMES NOW, Defendant/Cross-Claimant, MARTY MELTON,

individually and in his capacity as the Personal Representative of the Estate of

Sandra Rostig ("MELTON"), by and through his undersigned attorneys, and files

this his Response in Opposition to Defendant/Cross-Respondent DAVID

GREENBAUM, as parent and natural guardian of R.G.'s ("GREENBAUM")

Motion for Summary Judgment as to MELTON's Cross-Claim and on Count I of

GREENBAUM's Cross-Claim based on a finding that he is entitled to receive the

disputed funds at issue in this interpleader action, and in support thereof would state:

Summary judgment is improper in this case because there is a genuine dispute of material fact as to whether the Partial Withdrawal Requests signed by the annuitant, SANDRA ROSTIG ("ROSTIG"), and received by the issuer of the subject annuity policy, LIFE INSURANCE COMPANY OF THE SOUTHWEST ("LSW"), prior to ROSTIG's death, met the standards within the policy for a withdrawal and as such, the funds requested should be paid as instructed by the annuitant prior to distribution of the remaining value of the annuity policy to R.G., the beneficiary.

## I.   RESPONSE TO GREENBAUM'S UNDISPUTED MATERIAL FACTS

1.     MELTON has no objection to the facts as set forth in Paragraphs 1 through 15, 21 through 24, 26, 27, 29, 37 and 38 of GREENBAUM's Motion for Summary Judgment and Incorporated Memorandum of Law ("GREENBAUM's Motion" or "GREENBAUM Mtn.").

2.     As to Paragraphs 16 through 36 of GREENBAUM's Motion, MELTON would state that the summaries of the testimony of LSW representatives Kim Gray and Kathy Bennett are sufficiently accurate, though the

testimony was given from the perspective of an entity attempting to protect its own interests.

## II.   <u>MELTON'S COUNTERSTATEMENT</u>

3.      Part 1 of the "Flexible Premium Equity-Indexed and Declared-Interest Deferred Annuity Policy," Policy No. ending 262X ("Annuity Policy"), <u>Ownership of the Policy</u>, subsection entitled <u>Rights of Owner</u>, states that "[ROSTIG] may exercise all rights and privileges under this Policy, while the Annuitant is living, prior to the Annuity Date. Use of these rights may be subject to the consent of any Assignee or irrevocable Beneficiary." Exh. 1 to GREENBAUM Mtn., p. 7. *See* MELTON Amended Cross-Complaint ¶ 12; GREENBAUM Answer ¶ 12.

4.      The POLICY's Annuity Date was March 21, 2044. Exh. 1 to GREENBAUM Mtn., p. 5. *See* MELTON Amended Cross-Complaint ¶ 13; GREENBAUM Answer ¶ 13.

5.      The POLICY did not have any assignees or irrevocable beneficiaries while ROSTIG was alive. *See* MELTON Amended Cross-Complaint ¶ 14; GREENBAUM Answer ¶ 14.

6.      Part 4 of the Annuity Policy, <u>Policy Dates and Values</u>, subsection entitled <u>Total Withdrawals</u>, states that ROSTIG was authorized to withdraw all

of the Cash Value of the POLICY "at any time at or before the commencement of any annuity income payments. If you [ROSTIG] withdraw all of the Cash Value of this Policy, this Policy will terminate." Exh. 1 to GREENBAUM Mtn., p. 8.  *See* MELTON Amended Cross-Complaint ¶ 15; GREENBAUM Answer ¶ 15.

      7.    Part 4 of the Annuity Policy, entitled <u>Policy Dates and Values</u>, subsection entitled <u>Partial Withdrawals</u>, states that ROSTIG was authorized to withdraw "part of the Cash Value of this Policy at any time" prior to the Annuity Date, and partial Withdrawals were subject to the following limits: "each Partial Withdrawal must be at least $500" and "a Partial Withdrawal may not reduce the Accumulation Value to less than $2,500." Exh. 1 to GREENBAUM Mtn., pp. 9, 10. *See* MELTON Amended Cross-Complaint ¶ 16; GREENBAUM Answer ¶ 16.

      8.    ROSTIG, on December 23, 2019, prior to her death, spoke with an LSW representative who identified herself as Jen in a telephone conversation recorded by LSW, and stated "I have a policy and I'm leaving the country for medical help. I need to withdraw 100,000 from my policy; please, immediately, on an expedited basis." Depo. of Kim Gray, at 49:7-10. [The LSW recording of this telephone conversation is available for the Court's review.]

      9.    At the time ROSTIG conducted her conversation with the LSW representative, although she was physically weak from the effects of her cancer,

she was mentally competent, as reflected in the fact that when the LSW representative identified herself as Jen, ROSTIG confirmed the representative's name by re-stating it and then addressing Jen by name several times during their conversation. Depo. of Kim Gray, at 49:4-10, 52:22-53:11. [The LSW recording of this telephone conversation is available for the Court's review.]

10.     Jen advised ROSTIG that LSW had a form that required ROSTIG's signature on it and that it could be emailed to her, and ROSTIG requested the LSW representative to email the forms to her husband, MARTY [MELTON]. ROSTIG then asked if she could put MELTON on the phone, at which time MELTON got on the phone and continued the conversation with Jen, the LSW representative. Depo. of Kim Gray, at 49:11-52:20. [The LSW recording of this telephone conversation is available for the Court's review.]

11.     MELTON confirmed with Jen that ROSTIG needed to sign the form that was going to be emailed to him, and Jen advised the form could then be returned to LSW via fax, email or mail.  Depo. of Kim Gray, at 50:10-16. [The LSW recording of this telephone conversation is available for the Court's review.]

12.     On December 24, 2019, ROSTIG executed two National Life Group Annuity Withdrawal Request forms, one requesting a withdrawal of $100,000.00

and one requesting a withdrawal of $45,000.00, and a W-9 form. *See* Affidavit of Sebastian Sutula, a true and correct copy of which is attached hereto as Exh. A.

13.     ROSTIG's mental competency and understanding of the consequence of the documents she was executing was confirmed by her friend Sebastian Sutula, who was present when ROSTIG executed the aforementioned three documents, and who had visited her several times during her hospitalization. *See,* Sutula Aff., Exh. A.

14.     On the morning of December 26, 2019, MELTON emailed the two signed Annuity Withdrawal Request forms to Jen at LSW and requested she advise if there was anything else needed. Exh. 12 to GREENBAUM Mtn.

15.     ROSTIG died on December 26, 2019, at 5:28 p.m. *See* ROSTIG Certification of Death, a redacted copy of which is attached hereto as Exh. B.

16.     GREENBAUM makes several references in his Motion to the W-9 signed by ROSTIG, and particularly questions the fact that the W-9 submitted to LSW was signed on December 24, 2019, before LSW sent its letter requesting ROSTIG sign the W-9 it was providing. The intent of these references can only be to color the validity of the W-9, implying the W-9 was not signed by ROSTIG and that it was backdated. Sebastian Sutula, a disinterested witness, stated in his

Affidavit that he saw ROSTIG sign the W-9 form on December 24, 2019. *See* Sutula Aff., Exh. A.

17.    The Annuity Policy is silent with regard to defining what constitutes a "withdrawal" from the Annuity Policy or when such withdrawal vests. *See* Annuity Policy, Exh. 1 to GREENBAUM Mtn.

18.    In accord with the terms of the Annuity Policy ROSTIG's two Annuity Withdrawal Request forms were:

a.    signed by her when she was the Annuitant of the Annuity Policy (Sutula Aff., Exh. B; Annuity Policy, Exh. 1 to GREENBAUM  Mtn., p. 2);

b.    were submitted prior to the Annuity Date (Exh. 12 to GREENBAUM Mtn.; Annuity Policy, Exh. 1 to GREENBAUM  Mtn., p. 2);

c.    were each seeking the withdrawal of at least $500 (Exh. 12 to GREENBAUM Mtn.); and

d.    did not reduce the Accumulation Value to less than $2,500 (*See* document LSW-000564, produced in response to GREENBAUM's First Request for Production to LSW, a true and correct copy of which is attached hereto as Exh. C).

## III.   LEGAL STANDARD

Summary judgment is not proper if the nonmovant shows that there are genuine disputes of material fact and that the movant is not entitled to judgment as a matter of law. FRCP 56(a). *See, Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> To grant a motion for summary judgment, this Court must find that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The Court is not to weigh the evidence, but rather to determine if there is a genuine issue of fact Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. See Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990). Richardson v. AT&T Mobility Services LLC, 2016 WL 3457015, at 3 (USDC, D. So. Car., Charleston Div.).

## IV.   A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHEN THE PARTIAL WITHDRAWAL REQUESTS VESTED, RESULTING IN AN AMBIGUITY IN THE ANNUITY POLICY

In determining whether there is a genuine dispute of material fact that prevents summary judgment, this Honorable Court must consider all evidence in the light most favorable to MELTON as the nonmovant. *Tolan*, 572 U.S. at 656–57; *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1236–37 (10th Cir. 2002). The Court must also resolve all reasonable doubts about the facts in favor of

MELTON as the nonmovant. *Tolan*, 572 U.S. at 656; *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 455–56 (5th Cir. 2005).

GREENBAUM must prove that there is no ambiguity in the Annuity Policy that precludes the distribution of the funds requested by ROSTIG in her two Partial Withdrawal Requests prior to the distribution of the remaining value of the Annuity Policy to R.G. as the beneficiary. Because such ambiguity exists, there is a genuine dispute of material fact and as a result, GREENBAUM is not entitled to summary judgment.

> Under Florida law, courts must construe an insurance contract in its entirety, striving to give every provision meaning and effect. An insurance contract is ambiguous if it is susceptible to two or more reasonable interpretations that can fairly be made. When one of these interpretations results in coverage and another results in exclusion, ambiguity exists in the insurance policy. [citations omitted]. *Dahl-Eimers v. Mutual of Omaha Life. Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. Fla. 1993).

See also, *Fayad v. Clarendon Nat. Ins. Co.*, 899 So.2d 1082, 1086 (Fla. 2005) ("if the salient policy language is susceptible to two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous.")

The language of the Annuity Policy applying to ROSTIG's Partial Withdrawal Requests states, "Prior to the Annuity Date [March 21, 2044], [ROSTIG] may withdraw part of the Cash Value of this Policy at any time." The

Annuity Policy does not predicate such a partial withdrawal on there being sufficient time to process the withdrawal request prior to the death of the Annuitant. The Annuity Policy is silent as to any definition or description regarding the time it may take to process a withdrawal or when the withdrawal request vests, creating ambiguity.

> Ambiguity also may arise from silence. *Cf. Davis v. Crown Life Ins. Co.*, 696 F.2d 1343, 1346 (11th Cir. Fla. 1983) (ambiguity resulting from silence in certificate of insurance, which did not include a controlling provision recited in the master policy, treated as an express ambiguity). *Dahl-Eimers v. Mutual of Omaha Life. Ins. Co.* at 1381.

GREENBAUM argues that ROSTIG's right to make her withdrawals is predicated on the actual disbursement of the funds prior to death, further emphasizing the fact that the failure to define a time frame for processing of withdrawals creates an ambiguity in the interpretation of the Annuity Policy. GREENBAUM further argues that because the Annuity Policy defines "Policy Value" as including the deduction of "any amounts withdrawn," that the failure to process ROSTIG's Partial Withdrawal Requests prior to her death voids them. GREENBAUM determines that as a result, R.G. should receive the full value of the Annuity Policy, including the funds requested by ROSTIG in her Partial Withdrawal Requests; including the $100,000.00 ROSTIG orally instructed LSW she wanted to withdraw during her December 23, 2019, telephone conversation.

Pursuant to Florida law, the Annuity Policy must be construed in its entirety. *Auto-Owners Ins. Co. v. Anderson,* 756 So. 2d 29 (Fla. 2000). In this case, the Annuity Policy is silent as to when a Partial Withdrawal Request vests. Therefore, are funds deemed withdrawn as of:

      a.     The date the Partial Withdrawal Request is executed (which is when the Annuity Policy honors a change-of-beneficiary designation request; *see* Annuity Policy, Exh. 1 to GREENBAUM Mtn., p. 8);

      b.     Upon receipt of the executed Partial Withdrawal Request by the entity; or

      c.     As of the date the processing of the request is completed by the entity?

GREENBAUM's interpretation (processing of the Partial Withdrawal Requests had not been completed by the entity prior to ROSTIG's death) results in the exclusion of benefits to ROSTIG that the Annuity Policy freely gave to her as the owner and annuitant of the Annuity Policy. It was ROSTIG's intent, prior to her death, to withdraw funds from her Annuity Policy. Failure to pay those funds results in benefits for R.G. to which he was not entitled prior to ROSTIG's death.

If one is to follow GREENBAUM's argument, that the funds were not deemed withdrawn because they had not yet been paid out, one has to ignore the fact that the Annuity Policy specifically states that ROSTIG could withdraw funds from her Annuity Policy "at any time." "At any time" is not ambiguous. The failure of the Annuity Policy to define when a Partial Withdrawal Request vests creates an ambiguity and a genuine dispute, and as a result, GREENBAUM is not entitled to summary judgment. In fact, it could also reasonably be read that "Policy Value," which includes "any amounts withdrawn," could also require the entity to honor ROSTIG's Partial Withdrawal Requests prior to paying out the death benefit.

In support of GREENBAUM's Motion, he references an argument made by LSW in its Motion to Dismiss that the provisions of the Annuity Policy are such that any funds in the annuity at the time of the annuitant's death are payable to the designated beneficiary with no exceptions for pending withdrawals. It must be pointed out that no ruling was ever made on LSW's Motion to Dismiss and that the entity was, at the time, subject to a claim, and as such was attempting to protect itself from potential liability. Therefore, GREENBAUM's reliance on the Motion is misplaced.

## V.     <u>ROSTIG'S INTENT MUST BE GIVEN CONSIDERATION</u>

ROSTIG was the owner and annuitant of the subject Annuity Policy. She had made numerous withdrawals from the Annuity Policy over the years, as was her right as the annuitant. When ROSTIG designated R.G. as the beneficiary of her policy (R.G. was not the initial beneficiary), it was ROSTIG's intent that R.G. receive the remaining assets of her Annuity Policy after her death. Prior to her passing and pursuant to the express terms of the Annuity Policy, ROSTIG could partially withdraw funds from the Annuity Policy, she could withdraw all of the funds and cancel the Annuity Policy, or she could change the beneficiary of the Annuity Policy. R.G. had no claim at all to any of the assets of the Annuity Policy until after ROSTIG passed away, much less to the funds she stated she wanted withdrawn prior to her death.

ROSTIG, in her telephone conversation with the LSW representative, stated that she wanted to withdraw $100,000.00 from her Annuity Policy on an expedited basis. The amount to be withdrawn was subsequently increased to $145,000.00, with the funds to be paid to a joint account held with her husband, MELTON. ROSTIG's intent was clear; she wanted $145,000.00 from her Annuity Policy paid to her joint account, and for R.G. to receive whatever funds were left in the Annuity Policy after that payment.

## VI.    THE PARTIAL WITHDRAWAL REQUESTS ARE ANALOGOUS TO A CHANGE OF THE PAY-ON-DEATH BENEFICIARY DESIGNATION

There is a dearth of case law on annuity withdrawal requests, but the Court can look to the well-defined case law on change of beneficiary designations for guidance. It is undisputed that the Annuity Policy makes no mention of when a Partial Withdrawal Request vests, so we look to analogous cases for guidance.

> In Florida, "the right of an insured to change the beneficiary of a life insurance policy depends on the terms of contract between the insurer as expressed in the life insurance policy...." *Shuster v. New York Life Ins.,* 351 So.2d 62, 64 (Fla.Dist.Ct.App.1977). Where the right to change the beneficiary of a life insurance policy has been reserved, the named beneficiary "acquires no vested right or interest during the life of the insured, but acquires an expectancy." *Pendas v. Equitable Life Assur. Soc. of U.S.,* 129 Fla. 253, 176 So. 104, 110 (1937); *Ross v. Ross,* 20 So.3d 396, 398 (Fla.Dist.Ct.App.2009). *United States Life Ins. Co. in the City of New York v. Logus Mfg. Corp.,* 845 F. Supp. 2d, 1303, 1312 (SD Fla. 2012).

Case law follows that changes in beneficiary designations made in compliance with the requirements of the policy take effect on the date they are signed, not the date received by the entity or the date the entity implements the change of beneficiary designation, even if the change is presented after the policy owner has passed away. *See, Martinez v. Saez*, 650 So. 2d 668 (Fla. 3d DCA 1995).

*O'Brien v. McMahon*, 44 So. 3d 1273 (Fla. 1st DCA 2010) is a change-of-beneficiary case with a very similar background to the case at hand. In *O'Brien,*

the decedent executed a Prudential form in 1999 adding his newly-adopted daughter as a beneficiary and removing his niece (his other daughter was already a designated beneficiary). The decedent's Prudential policy permitted the change of beneficiary designation so long as the request was in writing "and in a form that meets our needs" and took effect when filed in the Home Office. *Id.*, at 1275. The policy additionally stated that "any previous beneficiary's interest will end as of the date of the request … even if the insured is not living when we file the request." *Id.,* at *1275-1276*. The decedent died in 2007 and Prudential indicated it needed to confirm the beneficiaries because the 1999 request had not been fully processed (there were issues regarding the designation of guardian vs. trustee for the minor beneficiaries). Prudential representatives testified that Prudential had never fully processed the change of beneficiary designation request. However, as the Court noted: "Nothing in the insurance policy requires 'processing' of any kind in order to render a duly filed request for change of beneficiary to become effective." *Id.*, at 1276, fn. 5. The Court also noted that "[t]he phrase 'in a form that meets our needs' plainly requires that a beneficiary request contain enough information to allow Prudential to act on the request." *Id.*, at 1279. The *O'Brien* Court determined that

Prudential understood the decedent intended his daughters were to be his beneficiaries under the policy.

Similarly, in our case, ROSTIG had properly executed the Partial Withdrawal Request forms the entity had provided via email to MELTON, at ROSTIG's direction, which MELTON subsequently printed out for ROSTIG to execute. All of the information requested by the entity on the forms the entity provided was accurate and the forms were executed by ROSTIG. As in *O'Brien*, the "processing" of the Partial Withdrawal Requests had not been completed prior to ROSTIG's death; however, the entity clearly understood that ROSTIG intended the funds to be withdrawn and deposited into her joint account with MELTON. Further, there was no provision in the Annuity Policy that the Partial Withdrawal Requests had to be "processed" to become effective.

This "reasonableness standard" was also set forth in *Strauss v. Teachers Ins. and Annuity Ass'n of America*, 37 Mass. App. Ct. 357 (1994); a case very similar to ours. In *Strauss,* the annuitant had three annuity policies with TIAA, two of which he converted into a single policy. Approximately two months after surgery for cancer, the annuitant contacted TIAA and inquired about changing the beneficiary designations on his policies. A couple of weeks later, the entity provided him with copies of the current beneficiary designations, a change of

beneficiary form listing only one policy number, and directions for completing same. The cover letter referenced both policy numbers and requested the annuitant provide the names of the new beneficiaries if he was also changing them on the second policy, so TIAA could prepare the appropriate form. The annuitant immediately completed and submitted the change of beneficiary designation for the one policy to TIAA, together with a letter referencing both policy numbers, specifically instructing that he wanted his former wife removed as a beneficiary and his three children designated as his beneficiaries on all of his policies with TIAA. TIAA subsequently sent a letter with its change of beneficiary designation form for the second policy, and later sent a follow-up letter when the executed form had not been returned. The annuitant never responded to the follow-up letters, as he was struggling with the recurrence of his cancer, and ultimately, he died before executing the second change of beneficiary designation form. The Court found there was not only evidence provided of full compliance with the contractual requirements, but also that there was sufficient evidence of substantial compliance, and affirmed the lower court's finding that the change of beneficiary designation was effective, stating:

> [The annuitant] never learned of any dissatisfaction on TIAA's part, and he died assuming there was nothing further for him to do. In the circumstances of this case, where [the annuitant] notified TIAA of a change of beneficiaries in a manner that satisfied the policy

requirements but died before receiving actual notice that further steps were necessary to effect the change, the jury could have found that there was substantial compliance with the policy. *Id.,* at 362.

A change of beneficiary designation to a policy nullifies all previous designations of the annuitant and invalidates the claim a prior beneficiary may have to any of the value of the policy. On the other hand, a partial withdrawal request merely decreases the amount that would ultimately be paid to the designated pay-on-death beneficiary. As such, one could surmise that the bar should be set higher for a change of beneficiary designation than a partial withdrawal of funds request. The Florida courts have already determined that a change-of-beneficiary designation form is valid even if received after the policy-owner's death and that "processing" of the change-of-beneficiary form need not be completed prior to the policy-owner's death to be enforceable. *See*, *Martinez v. Saez*, 650 So. 2d 668 (Fla. 3d DCA 1995) and *O'Brien v. McMahon*, 44 So. 3d 1273 (Fla. 1st DCA 2010).

Similarly, ROSTIG's Partial Withdrawal Requests were executed prior to her death and were actually received by the entity prior to her death, but the "processing" had not been completed by the entity prior to her death. As with a change-of-beneficiary designation request, ROSTIG's Partial Withdrawal

Requests should be honored, processed, and the payment made prior to any payment to R.G. of the remaining benefits of the Annuity Policy.

## CONCLUSION

The ambiguity in the Annuity Policy at issue has created a genuine dispute as to a material fact in this case – was ROSTIG permitted to withdraw funds from her Annuity Policy "at any time" prior to her death, as stated in the Annuity Policy, or is the "Policy Value" only reduced by withdrawals that have already been paid out, not withdrawals actually requested? To take this even a step further, if the entity had approved ROSTIG's Partial Withdrawal Requests prior to her death, but ROSTIG died before the funds had been deposited to her joint account, would GREENBAUM still have an argument that the funds had not actually been withdrawn? The silence in the Annuity Policy in failing to define what constitutes an actual withdrawal or when such withdrawal vests, results in this ambiguity.

There are numerous genuine disputes regarding the interpretation of the Annuity Policy, which are not the proper subject of a summary judgment motion, and based thereon, MELTON respectfully requests this Honorable Court deny GREENBAUM's Motion for Summary Judgment.

SIGNATURE ON FOLLOWING PAGE

DATED:  September 24, 2021      Respectfully submitted,

                                         BASKIN EISEL RIGHTMYER
                                         Attorneys at Law

                                         /s/  *Jeffrey A. Eisel*
                                         Jeffrey A. Eisel, Esq.
                                         Florida Bar No. 92365
                                         14020 Roosevelt Blvd., Suite 808
                                         Clearwater, FL  33762
                                         Telephone: 727-572-4545
                                         Facsimile:  727-572-4646
                                         Primary Email Address:
                                         jeisel@baskineisel.com
                                         Secondary Email Addresses:
                                         kathleen@baskineisel.com
                                         eservice@baskineisel.com
                                         Counsel for Defendant, MELTON

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on September 24, 2021, I electronically filed the foregoing "*Marty Melton's Response in Opposition to David Greenbaum's Motion for Summary Judgment and Incorporated Memorandum of Law*" with the Clerk of Court by using the CM/ECF System, which will then send a notice of electronic filing to all counsel of record listed below:

                    William J. Cook, Esq.
                    Barker Cook
                    501 E. Kennedy Blvd., Suite 1040
                    Tampa, FL 33602
                    wcook@barkercook.com
                    susan@barkercook.com

                                    /s/  *Jeffrey A. Eisel*
                                    Jeffrey A. Eisel Esq.
                                    BASKIN EISEL RIGHTMYER
                                    Attorneys at Law